## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

**DANELL BEHRENS, individually, and on behalf of all others similarly situated,**

      **Plaintiff,**

    vs.

**LANDMARK CREDIT UNION, and DOES 1-100,**

      **Defendants.**

**Case No.: 17-cv-101**

---

## CLASS ACTION COMPLAINT

---

Plaintiff Danell Behrens ("Plaintiff"), by her attorneys, hereby brings this class and representative action against Landmark Credit Union and DOES 1 through 100 (collectively "LCU" or "Defendant").

### NATURE OF THE ACTION

1.    All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel. Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal knowledge, as well as Plaintiff's or her counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.    This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all others persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public. LCU wrongfully charged Plaintiff and the class members overdraft fees.

3.    This class action seeks monetary damages, restitution, and injunctive relief due to

LCU's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches LCU's contract with its customers, who include Plaintiff and the members of the Class.

4.     The charging for such overdraft fees also violates federal law. Because LCU failed to describe its actual overdraft service in its opt-in notice (because the language in its opt-in notice fails to describe the actual method by which LCU calculates its overdraft fees, instead simply using the word "overdraft"), and because, alternatively, LCU did not obtain opt-ins from its customers whatsoever, Regulation E (12 C.F.R. §§ 1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*) prohibited LCU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. § 1005.17(b)(1)(i)), but LCU did so anyway.

## PARTIES

5.     Plaintiff is a resident of Johnson Creek, Wisconsin, and was a member of LCU at all times relevant to the class action allegations.

6.     Based on information and belief, Defendant LCU is and has been a Wisconsin state-chartered credit union with its headquarters in New Berlin, Wisconsin, and its primary business activities in the Milwaukee, Wisconsin area. LCU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.     Without limitation, defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of LCU and, upon information and belief, also own and/or operate LCU branch locations. Each of Defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)). As used herein, where appropriate, the term "LCU" is also inclusive of Defendants Does 1 through 100.

8.     Plaintiff is unaware of the true names of defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants Does 1 through 100 when the true

names are ascertained, or as permitted by law or by the Court.

9.      Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

10.     As to the conduct alleged herein, each act was authorized ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred, or a substantial part of property that is the subject of the action is situated, in Jefferson County, Wisconsin. Plaintiff resides in Jefferson County, Wisconsin; her LCU branch and bank account are located in Jefferson County, Wisconsin; Plaintiff's contract with LCU was signed in Jefferson County, Wisconsin; and the statements and representations described herein took place in Jefferson County, Wisconsin.

## FACTUAL ALLEGATIONS

### A.     LCU's Unlawful Charges of Overdraft Fees

13.     LCU is a credit union with over 30 branches in Wisconsin and holding approximately $3 billion in assets.  LCU offers its consumer banking customers a checking account.  One of the features of a LCU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a LCU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

14.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), LCU assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

15.    Overdraft fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as LCU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6 to 7% of the gross revenue of credit unions.  (April 2010 Filene Research Institute report entitled "Overdraft Regulation: A Silver Lining to the Clouds?").

16.    The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

17.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more

likely to pay an overdraft fee than whites. (*Id*. at p. 3).

18.    As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

19.    The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

20.    To qualify as affirmative consent, the opt-in agreement must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that may be assessed in a given day;

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The consent must state that alternatives, such as linking the checking account to a savings account or a line of credit, are available, if in fact

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_Rulemaking.pdf, at pp. 74-75.

they are available.

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

21.    At all relevant times, LCU has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with members; (2) contrary to LCU's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

22.    LCU entered into a contract with Plaintiff and its other customers titled "Account Agreement."

23.    The Account Agreement contains a promise that LCU will not charge overdraft fees for any type of transaction where there is enough money in the ledger balance of the account to pay for the transaction.

24.    LCU entered into a second contract with Plaintiff and its other customers titled "Electronic Services Disclosure."

25.    The Electronic Services Disclosure also contains a promise that LCU will not charge overdraft fees for any type of transaction where there is enough money in the ledger balance of the account to pay for the transaction.

26.    Moreover, on information and belief, another LCU contract, the Opt-In Agreement, through which LCU purports to enroll its customers into its overdraft program, promises that an overdraft fee will only result from a negative balance, in stating that an overdraft occurs when there is not enough money in the account to pay for a transaction.

27.    A fourth LCU contract, the Online Opt-In Agreement, through which LCU purports to "opt in" its customers online, promises that an overdraft fee will only result from an actual overdraft.  As used herein, the Account Agreement, the Electronic Services Disclosure,

the Opt-In Agreement, and the Online Opt-In Agreement are hereinafter collectively referred to as the "Customer Agreements."

28.     LCU also promises in the Customer Agreements that it will not assess overdraft fees on ATM and non-recurring debit card transactions against any customer who does not "opt in" to the overdraft service.

29.     LCU's contractual promises in its Customer Agreements to only assess overdraft fees when there is not enough money in the account to cover the item, and to only assess such fees for ATM and non-recurring debit transactions against customers who had fully "opted-in" to the overdraft program, were also provided to customers in other disclosures and marketing materials.

30.     However, directly contrary to these promises, LCU's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, LCU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation called the available-balance method rather than the ledger-balance method.

31.     The available balance is not the customer's actual balance (ledger balance). Rather, it is the actual balance of a customer's account (ledger balance) *minus* anticipated future debits (debits that may or may not occur) and *minus* credit holds. Not only is the practice of using the available-balance method rather than the ledger-balance method to determine whether a transaction results in an overdraft and thus is subject to an overdraft fee directly contrary to LCU's Customer Agreements, but such practices have resulted in LCU improperly charging, and continuing to charge, its members, including Plaintiff and the members of the Class, unlawful overdraft fees. Whether a financial institution uses the ledger-balance method versus the available-balance method is a primary concern for the Consumer Financial Protection Bureau (the "Bureau" or "CFPB") due to the substantial harm it causes to customers.  As the Bureau concluded from its studies of actual financial institutions in its Supervisory Highlights, Winter

2015, at p.8[2]:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method.

When the balance calculation method is not adequately disclosed, the Bureau has found the use of the available-balance method instead of the ledger-balance method is a deceptive practice, as it results in "customers being misled" because this information is "material to a reasonable consumer's decision-making and actions", and consumers are thereby "substantially injured". (*Id*. at p. 9.)

32.    LCU's practice of charging overdraft fees, even when there is money in the account to cover a transaction presented for payment, is inconsistent with how LCU expressly describes the circumstances under which overdraft fees are assessed in its Customer Agreements. Further, LCU has charged its customers, including Plaintiff and the members of the Class, overdraft fees for ATM and/or non-recurring debit card purchases, without obtaining their consent to do so, in violation of Regulation E, and in violation of its contractual promise in the Customer Agreements that it would not charge overdraft fees for ATM and non-recurring debit card purchases without obtaining its customers' separate consent.

33.    Alternatively, the Online Opt-In Agreement states that overdraft fees will result only from legitimate overdrafts, and does not disclose that LCU will assess fees based on the "available-balance method" even when sufficient funds exist in the account. The Opt-In Agreement likewise states that overdraft fees will only result from there being not enough money in the account to complete a given transaction. Accordingly, the Online Opt-In Agreement and Opt-In Agreement do not describe LCU's actual overdraft service as required by Regulation E.

---

[2] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

Consequently, LCU was not authorized to charge Plaintiff and the Class members overdraft fees on ATM and non-recurring debit card transactions because they did not provide an accurate "brief description of the financial institution's overdraft services" as required by Regulation E's Opt-In Rule.

34.     The Online Opt-In Agreement also fails to disclose the applicable overdraft fee, and fails to state the conditions under which an overdraft will occur, because it does not define the term "overdraft" in any manner.  Under 12 C.F.R § 230.4(b)(4), "[a]n institution must disclose the amount of any fee that may be imposed in connection with the account (or an explanation of how the fee will be determined) and the conditions under which the fee may be imposed."  Under Regulation E, the institution must state the amount of the fee to be imposed for overdrafts. (12 C.F.R. § 1005.17).

35.     The importance of Regulation E is highlighted by the fact that the Bureau's study of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[3]

36.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

37.     Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods.  The ledger balance is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.

38.     Further, based on information and belief, the ledger balance is the balance used by LCU to report its deposits to regulators, shareholders and the public.  It is the deposit balance

---

[3] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of LCU.

39. When LCU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the ledger balance. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the ledger balance and not the available balance, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (CFPB Supervisory Highlights, Winter 2015, at p. 9.)

40. Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

**B.    Unlawful Overdraft Fees Assessed to Plaintiff**

41. Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in her account to cover the transaction. Plaintiff entered into agreements with LCU wherein LCU contracted to charge overdraft fees only if her account did not have money to cover the transaction. By nonetheless charging Plaintiff overdraft fees when her account did contain enough money to complete the transaction, LCU breached its contracts with Plaintiff. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, to give one example, on December 21, 2015, Plaintiff had $239.61 in her account when she made a point of sale purchase for $32.50, leaving her with a positive balance of $207.11. Despite the fact that her account contained sufficient funds to complete the transaction, Plaintiff was assessed a wrongful "Check Card Overdraft Fee" in the amount of $30. Subsequently—even counting the wrongful overdraft fee—Plaintiff had $177.11 in her account when she made a point of sale purchase for $10.49, leaving her with a positive

balance of $166.62. Despite the fact that her account contained sufficient funds to complete the transaction, Plaintiff was assessed a second wrongful "Check Card Overdraft Fee" in the amount of $30. After that—even counting the two wrongful overdraft fees—Plaintiff had $136.62 in her account when she made a point of sale purchase for $21.95, leaving her with a positive balance of $114.67. Despite the fact that her account contained sufficient funds to complete the transaction, Plaintiff was assessed a third wrongful "Check Card Overdraft Fee" for $30. Plaintiff has a reasonable belief that a complete review of Plaintiff's and LCU's records will show multiple instances in which LCU improperly charged Plaintiff overdraft fees for transactions despite the fact that Plaintiff had enough money in her account to cover the transactions.

  42. Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which LCU assesses further overdraft fees. This practice was deemed to be deceptive and substantially harmful to customers by the Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(CFPB Supervisory Highlights, Winter 2015, a pp. 8-9.)    A complete evaluation of LCU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

43.    Additionally, in the alternative, LCU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions without obtaining Plaintiff's informed consent to do so whatsoever.  Because LCU was not legally authorized to enroll Plaintiff into the overdraft program for non-recurring debit card and ATM transactions, LCU violated Regulation E when it assessed *any* overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.

44.    Plaintiff was harmed by this practice when she was assessed overdraft fees for nonrecurring debit card and ATM transactions.  A complete evaluation of LCU's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

45.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

46.    Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

47.    The "Class" is composed of two classes:

**The Positive Balance Class:**

> **All United States residents who have or have had accounts with LCU who incurred overdraft fees when the ledger balance in the checking account was sufficient to cover the transactions in the six years preceding the filing of this Complaint.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with LCU who incurred overdraft fee(s) for ATM or non-recurring debit card transactions since August 15, 2010.**

12

48.    Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

49.    This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

### Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))

50.    The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that LCU has approximately $3 billion in assets and operates over 30 branches throughout the state of Wisconsin.

51.    Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of LCU's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

### Commonality (Federal Rule of Civil Procedure 23(a)(2)

52.    This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class members include, but are not limited to, the following:

   a.    Whether, pursuant to the Customer Agreements, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft

fee if there was enough money in the account to cover the transaction;

b.      Whether Defendant breached the Customer Agreements by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

c.      Whether the language in the Opt-In Agreement and Online Opt-In Agreement accurately described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees using an available-balance method instead of a ledger-balance method;

d.      Whether Defendant enacted a policy of assessing overdraft fees for ATM and non-recurring debit card transactions against its customers without opting them into the overdraft program whatsoever;

e.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

f.      Whether Defendant's conduct violated state consumer protection laws; and

g.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

### Typicality (Federal Rule of Civil Procedure 23(a)(3))

53.      Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Customer Agreements, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

## Adequacy (Federal Rule of Civil Procedure 23(a)(4))

54.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and her counsel intend to prosecute this action vigorously.

## Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))

55.    The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the

proceeds of their ill-gotten gains.

56.     Plaintiff is not aware of any separate litigation instituted by any of the class members against Defendant.  Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class members and that she will adequately represent the Class.  This particular forum is a desirable forum for this litigation because, during the majority of the time at issue in this case, Plaintiff resided in Johnson Creek, Wisconsin, where Defendant operates branch offices, and where the activities from which the claims arose took place.  Further, Defendant's headquarters are located in New Berlin, Wisconsin.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

57.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

58.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

    a.  Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1.  Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        2.  Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially

impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1. The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

59.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

60.    Plaintiff and each of the Class members entered into contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Customer Agreements.  These contracts were drafted by and are binding upon Defendant.

61.    In the Customer Agreements, Defendant promised that LCU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

62.    Plaintiff and the Class members have performed all conditions, covenants, and

promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

63. Defendant breached the express terms of the contracts by, *inter alia*, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

64. Defendant also breach the terms of the contracts by charging overdraft fees on ATM and non-recurring debit card transactions without obtaining Plaintiff's informed consent to do so, contrary to Regulation E, the requirements of which were incorporated into all of the contracts as a matter of law.

65. As a proximate result of Defendant's breach of the contracts, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

66. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

67. Plaintiff and each of the Class members entered into contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Customer Agreements. These contracts were drafted by and are binding upon Defendant.

68. In the Customer Agreements, Defendant promised that LCU would assess overdraft fees for ATM and debit card transactions only when there was not enough money in the account to cover the transaction.

69. Further, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means

preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

70.    The material terms of the contract also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contract.

71.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

72.    Defendant breached the implied covenant of good faith and fair dealing based on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions, and failing to permit its customers to choose whether to opt-in to the overdraft program for non-recurring debit and ATM transactions. In so doing, and in otherwise implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed a contractual obligation in bad faith, depriving Plaintiff and the Class members of the full benefit of the contract.

73.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION

**(Unjust Enrichment/Restitution)**

74.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

75.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

76.    The Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes Unfair, Deceptive, or Abusive Acts or Practices.  (CFPB Bulletin 2013-07[4], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

77.    Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

---

[4] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

## FOURTH CAUSE OF ACTION

### (Money Had and Received)

78.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.    Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

80.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION

### (Violation of Electronic Fund Transfers Act (Regulation E)

### 12 C.F.R. § 1005 *et seq*.  (authority derived from 15 U.S.C. § 1693 *et seq*.))

81.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.    By charging overdraft fees on ATM and nonrecurring transactions, LCU violated the EFTA by violating Regulation E (12 C.F.R. §§ 1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§ 1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§ 1693 *et seq*.), the "EFTA"] (§ 1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. § 1693(b)).

83.    Specifically, the charges violated what is known as the "Opt-In Rule" of Regulation E.  (12 C.F.R. § 1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to

21

*affirmatively consent*" to enter into the overdraft program. (*Id.*) (emphasis added).  The notice "shall be clear and readily understandable."  (12 C.F.R. § 205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

84.    The intent and purpose of this opt-in notice is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948) (emphasis added), which is "the CFPB's official interpretation of its own regulation," and which "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E.  *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

85.    LCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  LCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17, or, in the alternative, by failing to give them the opportunity to affirmatively consent—or not consent—to entry into the program whatsoever. LCU's Online Opt-In Agreement fails to satisfy 12 C.F.R. § 1005.17 because it states that an overdraft fee will simply result from an "overdraft" without defining or describing that term

when in fact LCU assesses overdraft fees when the actual balance is sufficient to pay for the transaction at issue, but the available balance is not. The Online Opt-In Agreement also fails to state the amount of the overdraft fee.

86. The Opt-In Agreement fails to satisfy 12 C.F.R. § 1005.17 because it states that an overdraft will result from there being not enough money in the account, when in fact overdrafts are assessed when there is enough money in the ledger balance to complete the transaction.

87. As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so LCU has harmed Plaintiff and the Class.

88. Due to LCU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## <u>SIXTH CAUSE OF ACTION</u>

**(Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18 *et seq*.)**

89. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

90. By the actions alleged above, Defendant has engaged in deceptive acts or practices against Plaintiff and the Class members in violation of Wis. Stat. § 100.18.

91. Defendant made false and misleading statements and representations to members of the public, including Plaintiff and other Class members, in violation of Wis. Stat. § 100.18.

92. Defendant's false and misleading statements and representations were made to Plaintiff and other members of the public to promote the sale of Defendant's products and services.

93. The false and misleading statements and representations were made by Defendant

in marketing materials and contracts provided to Plaintiff and other Class members, which were deceptive because, *inter alia*, Defendant promised Plaintiff and Class members that it would only assess fees for overdrafts where the transaction at issue exceeded the customer's ledger balance, *i.e.*, the actual amount of money in the customer's account.

94.    Those false and misleading statements and representations were intended to induce Plaintiff and the Class members to enter into contracts with Defendant, sign up for an account with Defendant, and/or enter into Defendant's overdraft program.

95.    Contrary to Defendant's false and misleading statements and representations, Defendant assessed fees based on a limited portion of the customer's account called the "available balance," even when the actual balance contained enough money to complete the transaction, and charged overdraft fees for ATM and non-recurring debit transactions despite its statements and representations that it would not do so.  Defendant even charged such fees against customers who had not opted in to the overdraft program whatsoever.

96.    Plaintiff and the Class suffered pecuniary harm as the result of Defendant's false and misleading statements, including but not limited to wrongfully assessed overdraft fees.

97.    Under § 100.18, Plaintiff and the Class are entitled to damages and other relief in a form and amount to be determined by a court of law.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For an order enjoining the wrongful conduct alleged herein;

5.      For costs;

6.      For pre-judgment and post-judgment interest as provided by law;

7.      For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

8.      For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.


DATED: February 9, 2017          BY:     s/ Douglas P. Dehler
                                         Douglas P. Dehler, Wisconsin Bar No. 1000732
                                         Doug.Dehler@wilaw.com
                                         Laura J. Lavey, Wisconsin Bar No. 1079346
                                         Laura.Lavey@wilaw.com
                                         **O'NEIL, CANNON, HOLLMAN, DEJONG
                                         & LAING S.C.**
                                         111 East Wisconsin Avenue, Suite 1400
                                         Milwaukee, Wisconsin 53202
                                         Telephone:  (414) 276-5000
                                         Facsimile:  (414) 276-6581

                                         Richard D. McCune, California Bar No. 132124*
                                         rdm@mccunewright.com
                                         Jae (Eddie) K. Kim, California Bar No. 236805*
                                         jkk@mccunewright.com
                                         **McCUNE WRIGHT AREVALO LLP**
                                         3281 East Guasti Road, Suite 100
                                         Ontario, California 91761
                                         Telephone:  (909) 557-1250
                                         Facsimile:  (909) 557-1275

                                         Taras Kick, California Bar No. 143379*
                                         Taras@kicklawfirm.com
                                         Robert Dart, California Bar No. 264060*
                                         Robert@kicklawfirm.com
                                         **THE KICK LAW FIRM, APC**
                                         201 Wilshire Boulevard
                                         Santa Monica, California 90401
                                         Telephone:  (310) 395-2988
                                         Facsimile:  (310) 395-2088

Attorneys for Plaintiff Danell Behrens
and the Putative Class

*Pro Hac Vice* Petitions to be submitted